UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| JEFFREY BASKIN, | : | |
| PLAINTIFF, | : | CASE NO. 19-CV-04554-GHW |
| v. | : | FIRST AMENDED COMPLAINT |
| NATIONAL ASSOCIATION OF INSURANCE COMMISSIONERS, and CHARLES THERRIAULT, individually, | : | JURY TRIAL DEMANDED |
| DEFENDANTS. | : | |

The Plaintiff, Jeffrey Baskin, by and through undersigned counsel, complains about the Defendants, National Association of Insurance Commissioners and Charles Therriault, as follows:

**NATURE OF ACTION**

1. This is an employment discrimination case involving claims of age-related hostile work environment and failure to promote, which culminated in constructive discharge, in violation of the Age Discrimination in Employment Act, as amended, 29 U.S.C. § 621 *et seq*. ("ADEA"); and the New York City Human Rights Law, Title 8 of the Administrative Code of the City of New York, as amended, ("NYCHRL").

**JURISDICTION AND VENUE**

2. The Court has jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343.

3. The Court has jurisdiction over Plaintiff's NYCHRL claims pursuant to 28 U.S.C. § 1367. Plaintiff's NYCHRL claims are so closely related to Plaintiff's claims brought under the ADEA that they form part of the same case or controversy as those terms are defined pursuant to Article III of the United States Constitution.

4. Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391(b)(2) because the events or omissions giving rise to the claims occurred within this judicial district.

**THE PLAINTIFF**

5. Plaintiff Jeffrey Baskin ("Plaintiff" or "Baskin") is a resident of the State of New York.

6. Plaintiff worked for Defendant National Association of Insurance Commissioners as a credit analyst from 2002 until his constructive discharge on or about March 31, 2017.

7. At the time of the constructive discharge, Baskin was sixty-six (66) years old.

**THE DEFENDANTS**

8. Defendant National Association of Insurance Commissioners ("NAIC") is the standard-setting and regulatory support organization for the United States, created and governed by the chief insurance regulators from the fifty (50) states, the District of Columbia and five (5) U.S. territories. Through NAIC, state insurance regulators establish standards and best practices, conduct peer review, and coordinate their regulatory oversight.

9. NAIC's central office is located in Kansas City, Missouri.

10. NAIC's Capital Markets & Investment Analysis Department, and various subdivisions, formerly known as the Security Valuation Office ("SVO"), which is where Plaintiff worked during the relevant time period, is located in New York City's Financial District.

11. At all relevant times to this legal action, Defendant Charles Therriault ("Therriault") was the Managing Director of NAIC's SVO where Baskin worked.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

12. On or about October 12, 2017, Plaintiff filled a Charge of Discrimination alleging age discrimination with the United States Equal Employment Opportunity Commission ("EEOC").

13. Plaintiff received a Notice of Right to Sue Letter from the EEOC on or about February 19, 2019.

14. This action has been commenced within ninety (90) days of Plaintiff's receipt of the Notice of Right to Sue Letter from the EEOC.

## FACTS RELEVANT TO ALL CLAIMS

15. As an Analyst III in the SVO, Plaintiff performed analytic functions mainly focused on the credit worthiness and pricing of corporate securities in the energy sector, such as oil and gas and renewable energy companies, and documented his analysis and findings in a series of reports, including but not limited to Non-Rated Securities Acquisition reports (NRSRA'S), Annual Update Reports, Initial File reports, and reports regarding appeals.

16. As an Analyst III, Baskin also mentored a few subordinate employees on an informal basis on his own initiative.

17. Throughout his tenure at NAIC, Plaintiff consistently received positive performance evaluations from his direct supervisors who rated his work product as exceeding expectations.

18. Unlike Baskin's direct supervisors, who were NAIC employees for many years, Defendant Therriault was critical of Plaintiff's performance in the same manner Therriault expressed baseless negative views about the work performance and contributions of other long-term NAIC employees who, like Baskin, were in their 60s or older.

19. Defendant Therriault became NAIC's SVO Managing Director in or about 2011.

20. From the outset of his tenure at NAIC, Defendant Therriault diminished the importance of long-time NAIC employees, most of whom, like Baskin, were over sixty (60) years of age, while simultaneously promoting the views and contributions of younger NAIC employees who he hired.

21. Defendant Therriault diminished the importance of long-time NAIC employees, like Baskin, by *inter alia*, devaluing their opinions and insights.

22. In meetings with Baskin and other analysts regarding company-specific credit ratings, Defendant Therriault reflexively adopted the views of younger, less experienced employees over Baskin, often ignoring the financial metrics and other factual bases that supported Plaintiff's assessment.

23. For example, at a credit committee meeting regarding a government-owned utility in the Caribbean, Defendant Therriault ignored Plaintiff's demonstration that the company's financial metrics had improved, which Plaintiff believed warranted the maintenance of NAIC's existing rating.

24. However, Linda Phelps ("Phelps"), a new NAIC analyst who had been hired by Defendant Therriault, recommended a downgrade of the utility's NAIC rating, and despite providing no specific fact-based reason for the downgrade, Defendant Therriault immediately supported her recommendation.

25. Defendant Therriault also diminished the importance of older NAIC employees, like Baskin, by refusing to promote them to management-level positions and by instead promoting younger employees with less expertise and experience.

26. Upon information and belief, Defendant Therriault encouraged a younger analyst who he hired, Kathy Constantano ("Constantano"), to apply for a Team Leader position in 2016 so that he would not have to give the position to Baskin, but Constantano refused.

27. In the position of Team Leader, Plaintiff's responsibilities increased. In addition to his own workload, Baskin had some supervisory authority over five (5) low-level analysts.

28. As a Team Leader, Baskin also made himself available to review the work of other Team Leaders who were newer to NAIC and did not have his expertise in the development of the various reports issued by NAIC analysts.

29. In or about January 2017, Baskin applied for another promotion to Credit Manager, a management-level position.

30. When Plaintiff applied for the Credit Manager position, he was sixty-six (66) years old.

31. At no time during his tenure at NAIC, either before or after he applied for the Credit Manager position, did Baskin ever say or otherwise suggest to anyone working at NAIC that he intended to retire in his 60s.

32. In addition to working at NAIC full-time, Plaintiff taught college-level insurance and business classes as an adjunct professor at Baruch College and The Borough of Manhattan Community College, a part-time job he has held since 1985, and continues to perform to date, and hopes to continue performing well into the foreseeable future.

33. Three (3) other NAIC Team Leaders applied for the same Credit Manager position that Baskin applied for in January 2017.

34. None of the other applicants were over the age of sixty (60).

35. The interview process for the Credit Manager position in January 2017 consisted of separate in-person meetings with Defendant Therriault, NYC-based manager Hilary Renz, ("Renz"), and NAIC In-House Counsel Bob Carcano ("Carcano").

36. In addition, Plaintiff had a telephone interview with a manager based in Kansas City named Winnie Cheng ("Cheng").

37. Plaintiff's direct supervisor, Harry Olsen ("Olsen"), was not on the hiring committee for the Credit Manager position that Plaintiff applied for in 2017.

38. During the telephone interview with Cheng, which occurred first, Cheng asked Baskin directly: "Charles [Therriault] wants someone who will stay in the [Credit Manager] position for the next five (5) to ten (10) years and eventually replace him. Could you do that?"

39. Plaintiff responded to Cheng: "Yes, that would not be a problem."

40. Prior to the interview, Cheng expressed her support for Plaintiff's requested promotion and gratitude for the professional feedback and mentoring he had provided to her. At the time, Cheng had been employed at NAIC for only approximately one (1) year. She was similarly supportive of Plaintiff during the interview for the Case manager position.

41. When Baskin met with Defendant Therriault, Plaintiff asked him if that was true that the Credit Manager was someone who could eventually take over his position. Therriault responded that it was true, then asked Plaintiff if he wanted to withdraw his application, to which Baskin responded, "No."

42. Baskin explained to Defendant Therriault at that time that he expected to continue working at NAIC for the foreseeable future.

43. Shortly thereafter, Defendant Therriault informed Baskin that he had not been selected for the Credit Manager position.

44. Instead, Plaintiff's co-worker, Phelps, received the promotion.

45. At the time of her promotion to Credit Manager, Phelps had worked at NAIC for approximately two (2) years, and was, upon information and belief, in her mid-forties or early fifties.

46. Defendant Therriault promoted Phelps over Baskin even though Plaintiff had consistently produced more work product than Phelps.

47. Both Phelps and Baskin worked as Team Leaders before Phelps' promotion to Credit Manager, and therefore, were subject to the same job requirements.

48. For example, Team Leaders were expected to produce 45 or more NRSAR equivalent reports on an annual basis.

49. In 2016, Plaintiff prepared forty-six (46) NRSAR equivalent reports and Phelps completed forty-one (41).

50. Upon information and belief, Phelps complained to Defendant Therriault about the "45 or more" NRSAR quota for Team Leaders in or about the end of 2016.

51. Shortly before Phelps' promotion was announced in or about March 2017, Defendant Therriault lowered the annual NRSRA report quota for Team Leaders to 30 reports.

52. Until she became Credit Manager, Phelps periodically asked Baskin to review her work product or to be a secondary sign off on her reports.

53. When Baskin did review Phelps' work, Plaintiff found substantive errors in the analysis, such as missing information about corporate loans and other key information that affects credit ratings, or similar corporate loans with different rates, which generally raise flags regarding credit worthiness and merit notation in a NAIC report.

54. When Defendant Therriault informed Plaintiff that Phelps received the promotion, Baskin complained about this decision.

55. Baskin wondered aloud why Phelps was promoted twice in her two (2) years (or less) at the NAIC and Plaintiff was stuck in the Team Leader position doing pretty much the same work he had done satisfactorily for more than thirteen (13) years.

56. During this conversation, Defendant Therriault never said anything to deny Plaintiff's allegation that he had "plateaued" at NAIC and would never be a manager.

57. At around the same time that Defendant Therriault denied Plaintiff the promotion to the Credit Manager position, and refused to say he would consider Baskin for any other management-positions in the future, the intensity of the hostile work environment increased as Defendant Therriault began to more aggressively criticize and undermine Baskin's work product, and in doing so began to tarnish Plaintiff's reputation within SVO.

58. For example, in a meeting with an insurance company to discuss renewable energy projects, for which Baskin was the primary analyst, the insurance company strongly asserted that NAIC's designations were incorrect.

59. In support of their argument, the insurance company pointed out that a Moody's study demonstrated that the overwhelming majority of the proposed renewal energy projects received high investment grades.

60. Plaintiff advised Defendant Therriault that the Moody's study of high investment grade designations was probably incorrect as it included more than renewable project transactions such as roads, bridges and tunnels, airports, and the like.

61. Defendant Therriault ignored Baskin's input and told him "not to worry about it" in a manner that suggested Plaintiff would likely not be part of the ultimate decision-making on the credit designation for the insurance company in question.

62. Similarly, Plaintiff helped NAIC's SVO develop a methodology to determine a designation for renewable energy transactions.

63. In developing that methodology, Plaintiff shared with Defendant Therriault his concerns regarding the manner in which a trade group, the American Council of Life Insurers ("ACLI") suggested that NAIC value a renewable energy transaction by taking into account the "net present value."

64. Baskin told Defendant Therriault that he strongly disagreed with ACLI's methodology, finding no support for including net present value as a metric in peer-reviewed analyses. Plaintiff suggested that net present value as a metric was too subjective because in most cases a 15 - 25 year transaction depended on future cash flows, interest rate projections and other criteria that net present value could not accurately take into consideration.

65. Defendant Therriault dismissed Plaintiff's concerns and told him again: "Don't worry about it," which suggested to Baskin that his input in the development of the methodology was not welcome.

66. In addition, Renz, an older supervisory NAIC employee, warned Baskin against reviewing too many reports developed by other analysts who he was not responsible for mentoring as a team leader. Renz told Plaintiff that Defendant Therriault commented to him that Baskin reviewed too many reports, suggesting that the volume of Plaintiff's work was an indicator that Plaintiff's work on those reports was not up to par, which was a baseless claim.

67. After Plaintiff was denied the promotion to Case Manager, and after he was subjected to several weeks of Defendant Therriault's increasingly aggressive criticism and undermining of his work, Baskin informed Defendants, in an e-mail to Therriault, that he could not continue working for NAIC and would resign effective March 31, 2017.

68. Baskin's constructive discharge was informed by Defendant Therriault's discriminatory treatment of Plaintiff because of his age, including his refusal to promote Baskin to a management position and the increasing hostile work environment, and Defendants' discriminatory treatment of other older employees after Defendant Therriault became Managing Director of SVO.

69. Like Plaintiff, Olsen, Baskin's direct supervisor, had also been subjected to Defendant Therriault's discriminatory efforts to undermine his effectiveness as a manager and his position within NAIC, and Baskin was aware of the hostile work environment Olsen was being subjected to because of his age.

70. Olsen worked at NAIC for approximately ten (10) years, five (5) years under the direct supervisor of Defendant Therriault.

71. During those five years, Defendant Therriault subjected Olsen to baseless criticism regarding his alleged lack of computer literacy even though Olsen, who was in his 70s at the time, regularly used e-mail and word processing applications to perform his work without issue, as he did throughout the years he worked at NAIC before Defendant Therriault became managing director and his direct supervisor.

72. Nevertheless, Defendant Therriault documented Olsen's alleged lack of computer literacy and other alleged deficiencies in performance evaluations and used his allegations about

Olsen's poor performance to give Olsen less than stellar reviews and minimal annual salary increases.

73. In or about 2015, Olsen complained to NAIC headquarters in Kansas City about Defendant Therriault's discriminatory mistreatment of him.

74. Despite Olsen's 2015 complaint to NAIC about Defendant Therriault's discriminatory mistreatment, NAIC did nothing to stop Defendant Therriault's illegal conduct and it continued.

75. During the two years prior to Plaintiff's constructive discharge in March 2017, Defendant Therriault was responsible for the involuntary departure of many older NAIC employees, including but not limited to Plaintiff's co-workers James Mitchel ("Mitchel"), Gary Mescher, and Richard Newman, all of whom were over the age of sixty-five (65).

76. In addition, Sharad Gupta ("Gupta"), a manager, was informed by Defendant Therriault that he would be fired if he did not fire certain long-term older employees, including Karen Stefancic ("Stefancic").

77. When Gupta refused to fire Stefancic for no reason (other than her age, which was over sixty (60)), Defendant Therriault told Gupta: "You have failed at your job and now I have to do it!"

78. Similarly when Mitchel, another long-term older NAIC employee failed to leave his position after Defendant Therriault suggested he did not have a future at NAIC, Mitchel was subjected to an alleged re-evaluation of his work duties and his performance, which made him feel so uncomfortable that he ultimately quit.

79. Plaintiff's constructive discharge was informed by his own experience and the experiences of other older employees at NAIC, as described herein, who were similarly subjected

11

to a hostile work environment by Defendants because of their age, which made Plaintiff feel very uncomfortable and absolutely unwelcome.

80. As a result of the discriminatory treatment Plaintiff experienced at NAIC, which culminated in his constructive discharge because he could no longer endure working for Defendants after being mistreated and denied promotion because of his age, Baskin has experienced economic loss and emotional distress.

## COUNT I

### AGE DISCRIMINATION IN VIOLATION OF ADEA AGAINST NAIC

81. Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

82. At all relevant times to this action, NAIC employed Plaintiff within the meaning of the ADEA.

83. By failing to promote Plaintiff to the Case Manager position in 2017 because of his age, which was over 65 at that time, NAIC has discriminated against Plaintiff on the basis of age in violation of the ADEA.

84. NAIC acted intentionally and with malice and/or reckless indifference to Plaintiff's statutorily protected rights.

85. Plaintiff has suffered and will continue to suffer irreparable injury, monetary damages, mental anguish, emotional damages, humiliation, insult to dignity, and other compensable damages as a result of NAIC's discriminatory practices.

## COUNT II

### AGE DISCRIMINATION IN VIOLATION OF NYCHRL AGAINST ALL DEFENDANTS

86. Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

87. At all relevant times to this action, Defendants NAIC and Therriault employed Plaintiff within the meaning of the NYCHRL.

88. Defendants NAIC and Therriault intentionally discriminated against Plaintiff because of his age by failing to promote him to a management-level position and by subjecting him to a hostile work environment, which culminated in his constructive discharge, when Defendants deliberately created working conditions that were so intolerable, difficult or unpleasant that Plaintiff felt compelled to resign, in violation of the NYCHRL.

89. The age-related hostile work environment, which culminated in Plaintiff's constructive discharge, rose above the level above petty slights and trivial inconveniences, and Defendants NAIC and Therriault failed to promote Plaintiff because of his age, thereby treating Plaintiff less well because of his age. Accordingly, Defendants have discriminated against Plaintiff on the basis of age in violation of the NYCHRL.

90. As Plaintiff's supervisor, Defendant Therriault is personally liable for his own illegal discriminatory conduct, and the aiding and abetting of NAIC's discriminatory treatment of Plaintiff, pursuant to N.Y.C. Admin. Code § 8-107.

91. Plaintiff has suffered and will continue to suffer irreparable injury, monetary damages, mental anguish, emotional damages, humiliation, insult due to Defendant's discriminatory practices.

## JURY DEMAND

92. Plaintiff demands a trial on all issues triable by a jury.

WHEREFORE, Plaintiff respectfully requests that this Court grant him injunctive relief to enjoin and permanently restrain Defendants for violating his civil rights under the ADEA and NYCHRL; declare that the acts and practices complained of herein are in violation of the ADEA

and NYCHRL; render a judgment sufficient to compensate him for economic, emotional and psychic injuries, humiliation, suffering, insult to dignity, and to provide necessary treatment; and to punish Defendants for their violation of law and deter similar violations in the future; grant Plaintiff such interest as in permitted by law; attorneys' fees and all other costs associated with bringing this action against Defendants; and, all such additional relief as this Court may deem just and appropriate under the circumstances.

Dated: July 9, 2019

        Respectfully submitted,

        LAW OFFICE OF DANIELA NANAU P.C.

        _____
        By: Daniela Nanau
        89-03 Rutledge Avenue
        Glendale, New York  11385
        Telephone: (888) 404-4975
        Facsimile: (718) 998-6916
        E-Mail: dn@danielananau.com

        ATTORNEYS FOR PLAINTIFF